

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MSA
F. #2015R01749

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 28, 2019

By ECF

The Honorable Ann M. Donnelly
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   United States v. Yevgeniy Braziler
            Criminal Docket No. 17-385 (AMD)

Dear Judge Donnelly:

      The government respectfully submits the following with respect to sentencing in the above-captioned matter. For the reasons discussed herein, the government respectfully submits that some term of incarceration is appropriate for this defendant.

    A.  Background

      On October 11, 2018, the defendant pled guilty to one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, for orchestrating a real-estate investment fraud scheme. Pursuant to the scheme, the defendant created a succession of LLCs to receive investor funds, which he represented would be used to purchase, renovate, rent and eventually re-sell residential property, largely in the Buffalo, New York area. See Presentence Investigation Report ("PSR") at ¶ 4. In order of formation, the most pertinent LLCs were Tri-State Development ("Tri-State"), Liberty State Development ("Liberty State") and Buffalo Housing. While the defendant initially used investor funds to purchase real estate, he quickly learned that his investment model was not successful, and was losing money. See PSR ¶¶ 5-7. Nevertheless, the defendant continued to represent the opposite to investors both to avoid admitting that the investments were unsuccessful and solicit investments in additional LLCs. See PSR ¶ 6.

      With each successive LLC, the defendant purchased fewer rental properties with investor funds and instead increased his misappropriation of investor funds. See PSR ¶¶ 5-7. Thus, the defendant used investor funds to purchase six rental properties through Tri-State, but used only approximately $157,000 of approximately $830,700 in investor funds to purchase four properties through Liberty State. See PSR ¶¶ 5-6. The defendant took a large portion of the investments in Liberty State for his own use. Id.

Despite being aware that Tri-State and Liberty State had not used investor funds as promised and lost money, the defendant solicited investors in Buffalo Housing, promising high returns from real estate investments. See PSR ¶ 7. The defendant received approximately $978,000 in investments in Buffalo Housing, but only purchased one property for $12,000. See id. Instead of using investor funds as he represented, the defendant took at least $323,510 for his own use, which he spent on items such as credit card bills, pet supplies, alcohol, restaurants and his child's school tuition, and gave additional funds to his co-conspirators. See id. To further the scheme and avoid detection, the defendant represented to investors that Buffalo Housing actually held numerous properties, and even solicited investors for more money to repair the real estate so he could sell it and return a large profit to the investors, even though the LLC neither held properties nor was about to earn profits through a sale of real estate. See PSR ¶¶ 7-8. Investors who provided money for supposed repairs lost those funds in addition to their investment principal.

The defendant returned a minimal amount of funds to only a few investors, mostly in response to persistent complaints or threats to initiate legal proceedings. See PSR ¶¶ 7-8. What few properties the LLCs had owned, the defendant simply abandoned into foreclosure or forfeiture by local authorities.

B. Guidelines Calculation

The defendant has stipulated to the guidelines calculation in his plea agreement, and the parties and the Probation Department concur in the calculation. Thus, the total adjusted offense level is 24 and, with a criminal history category of I, the advisory guidelines term of imprisonment is 51-63 months. See PSR ¶¶ 25, 28, 54. The Probation Department has calculated restitution due in the amount of $2,567,908. See PSR ¶ 11. The government concurs in the calculation.

C. Sentencing Considerations

With one exception set forth below, the government does not possess information not already set forth in the record that it believes would be useful to the Court at sentencing. The government respectfully submits that, in light of all of the sentencing factors set forth in 18 U.S.C. § 3553(a), especially the severity of the offense, which involved a lengthy period of repeated criminal conduct, a large amount of stolen funds and the targeting of elderly victims, some period of incarceration is appropriate.

The government writes to address one point in the defendant's submission, however. Despite stipulating in his plea agreement that a two-point enhancement applies under USSG § 3A1.1(b)(1) for targeting vulnerable victims, he denies that he did so. The opposite is true.

Guidelines Section 3A1.1(b)(1) instructs a sentencing court to apply a two-point enhancement to a defendant's offense level "if the defendant knew or should have known that a victim of the offense was a vulnerable victim." Furthermore, another two-point enhancement is warranted where "the offense involved a large number of vulnerable victims." See USSG

§ 3A1.1(b)(2). The Guidelines commentary provides that, "vulnerable victim means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or is otherwise particularly susceptible to criminal conduct." USSG § 3A1.1 comment. (n.2). The commentary further notes that the enhancement "should not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile." Id.

The facts of this case establish that the defendant's targeting of victims was anything but random, and that he re-targeted the same individuals repeatedly, even after learning of their advanced age. First, as noted in the PSR, 31 of 81 victims have died. See PSR ¶ 11. While not sufficient in itself to prove that the defendant targeted vulnerable victims, it cannot be a coincidence that such a significant number of the defendant's investors have passed away. Rather, the fact that nearly half of the defendant's victims are deceased suggests that he targeted elderly individuals for his scheme.

Second, the defendant's assertion that he used a list of individuals he received from Dun & Bradstreet to market his investment scheme is unavailing. Even if the defendant has truthfully represented the source of his marketing list, that fact does not exclude the possibility that the defendant sought out a list of elderly individuals to solicit. More importantly, the defendant has admitted to the government in proffer sessions that, even if the names were produced randomly by Dun & Bradstreet, the defendant continued to re-solicit the same investors for his second, third and fourth partnerships even after he was aware from interactions with same individuals over earlier investments that many were elderly.

Third, only a few examples of the victims suffice to show that the defendant targeted them because they were vulnerable. For instance, in 2005, the defendant contacted Victim #1 ("V-1"), an 87 year-old man, and solicited his investment in Liberty State, promising, among other things, a 14% annual dividend. In reliance on the defendant's false statements, V-1 invested approximately $110,000 with the defendant. After V-1 invested in Liberty State, the defendant solicited V-1's investment in two additional ventures, promising a return of three times the amount of any investment. V-1 invested an additional approximately $190,000.

Over the course of several years, V-1 and the defendant communicated approximately weekly. In approximately 2009, the defendant claimed that he was in the final stages of closing a sale of the properties owned by Buffalo Housing that would garner the promised return on investment, but asked V-1 to send an additional $20,000 needed to close the transaction. V-1 refused to invest more funds.

During the next year, the defendant continued to represent to V-1 that a closing was imminent, but had been briefly postponed. At the time, the defendant's businesses owned few, if any properties, and such a sale never occurred. The defendant never returned V-1's money. V-1 died in approximately November 2011. These facts strongly suggest that the defendant, over the course of his monthly contact with V-1 over a nearly six-year period, became aware that V-1 was elderly yet continued to solicit him for investments and lie about the status of existing investments to avoid detection of the scheme.

In approximately 2004, the defendant contacted Victim #2 ("V-2"), who suffered from dementia, to solicit his investment in Liberty State. Between approximately 2004 and 2006, V-2 invested approximately $72,000 in Liberty State. Concerned for V-2's finances, V-2's son sent the defendant a letter seeking return of the investment. During the same period, unbeknownst to V-2's son, V-2 continued to send money to the defendant. V-2 passed away in approximately December 2011. As with V-1, the facts indicate that the defendant targeted V-2 because of his vulnerable status as an elderly individual suffering from dementia.

The defendant and a co-conspirator solicited Victim #3 ("V-3"), a 78-year-old man, to invest in their various real estate ventures. Victim #3 invested approximately $260,000. After his investment, V-3 called the defendant every month for a period of years. In approximately 2014, the defendant asked V-3 for a loan of approximately $3,000, which V-3 made. Later, the defendant convinced V-3 to send another $2,000, purportedly to pay an accountant to produce IRS form K-1s concerning the investments. In approximately fall of 2016, the defendant stopped returning V-3's calls. The defendant never repaid the loans or returned V-3's investment. The defendant's repeated solicitation of 78 year-old man constitutes the targeting of a vulnerable victim.

The defendant and two co-conspirators contacted Victim #4 ("V-4") in approximately 2003. Between approximately 2003 and 2010, V-4 invested a total of approximately $150,000 in various entities the defendant controlled. Even though the defendant and his co-conspirators continued to solicit V-4 until 2010, in approximately 2008, V-4 began showing symptoms of dementia. In 2009, V-4's family intervened and a court appointed a family member as V-4's guardian, in part due to concerns that V-4 continued to invest his money in various schemes. In 2010, unbeknownst to the guardian and based upon the defendant's solicitation, V-4 invested another $5,000 with the defendant.

In 2009, V-4's guardian asked the defendant whether V-4's investments in the housing ventures could be sold, and the defendant replied, in sum and substance, that if the guardian could find someone willing to buy the investments, the guardian should "go ahead" and sell them. The defendant did not offer to return any of V-4's money.

The defendant's co-conspirators convinced Victim #5 ("V-5"), a 92 year-old man, to invest in several real estate ventures. Afterwards, V-5 dealt with the defendant, who convinced V-5 to invest more money. In total, V-5 invested approximately $250,000 with the defendant and his co-conspirators, and did not receive any funds in return. The loss of V-5's investments led him to declare bankruptcy. V-5 last spoke with the defendant in mid-2016 in an attempt to receive his money back, and the defendant told V-5 that he was putting things in place to sell the properties. V-5 did not hear from the defendant again.

The foregoing constitutes a representative sample of the defendant's victims and is certainly not exhaustive. Indeed, the government interviewed dozens of victims in its investigation, most of whom fell within the pattern outlined above. Based on the foregoing, the defendant clearly targeted one or more vulnerable victims within the meaning of USSG § 3A1.1,

and the government respectfully submits that the Court should take such conduct into account in crafting an appropriate sentence.

  D. <u>Conclusion</u>

    For the foregoing reasons, some term of incarceration is appropriate for the defendant.

               Respectfully submitted,

               Matthew S. Amatruda
               United States Attorney

        By: <u>/s/ Matthew Amatruda</u>
           Matthew Amatruda
           Assistant U.S. Attorney
           (718) 254-7012